**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**MEDFORD DIVISION**

**TAMMY JOYCE BROWN,**

            Plaintiff,

   v.

**COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,**

          Defendant.

Civil No. 1:14-cv-01867 -ST

**OPINION AND ORDER**

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Tammy Joyce Brown ("Brown"), seeks judicial review of the final decision by the Social Security Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-433. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgments in this case in accordance with FRCP 73 and 28 USC § 686(c) (docket #6).

Because the Commissioner's decision is not supported by substantial evidence, it is reversed and remanded for further administrative proceedings.

1 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Brown protectively filed for DIB on May 21, 2010, and later filed for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 USC §§ 1381-1383f,[1] alleging a disability onset date of December 31, 2004.  Tr. 23, 104-07.[2]  Brown's applications were denied initially and on reconsideration.  Tr. 63-67, 69-72.  On September 24, 2012, a hearing was held before Administrative Law Judge ("ALJ") Anthony J. Johnson, Jr. Tr. 750-87.  The ALJ issued a partially favorable decision on November 30, 2012, finding Brown eligible for SSI as of December 14, 2010, but also finding that she did not establish a disability for DIB prior to her last insured date of September 30, 2010.  Tr. 23-37.  The Appeals Council denied a request for review on September 22, 2014.  Tr. 6-8.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court. 20 CFR § 410.670a.

## BACKGROUND

Born in 1962, Brown was 42 years old at the time of the alleged disability onset date. Tr. 104.  She has a high school education and past work as an administrative office clerk. Tr. 138, 780.  Brown alleges that she has been unable to work since December 31, 2004, due to the combined severe impairments of bipolar disorder, depression, agoraphobia, anxiety, sleep problems, social problems, and borderline personality disorder.  Tr. 137.

///

---

[1]  The date when Brown filed the SSI application is unclear. The SSI application is not in the official transcript of the record, and the ALJ's decision cites two dates:  July 30, 2012 (Tr. 23) and June 27, 2011 (Tr. 37).

[2]  Citations are to the page(s) indicated in the official transcript of the record filed on April 7, 2015 (docket #13).

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(i)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her

impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099.

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

The ALJ determined that Brown met the insured status requirements of the Act through September 30, 2010.  Tr. 26.

At step one, the ALJ concluded that Brown has not engaged in substantial gainful activity since December 31, 2014, the alleged onset date.  *Id*.

At step two, the ALJ concluded that since December 31, 2004, Brown has had the severe impairments of PTSD, bipolar disorder, panic disorder, personality disorder NOS, and anxiety disorder.  *Id*.  At step three, the ALJ concluded that Brown does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  *Id*.

The ALJ found that prior to December 14, 2010, Brown had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: "she is able to use commonsense understanding to perform detailed but uninvolved written or oral instructions; she is able to occasionally tolerate contact with coworkers and supervisors." Tr. 27. The ALJ further found that after December 14, 2010, Brown had the same RFC, but with the additional nonexertional limitation that "she would likely be absent from work two or more days a month, on account of the intrusion of mental health symptoms." *Id*.

At step five, the ALJ found that considering Brown's age, education, and RFC, prior to December 14, 2010, she was capable of performing the requirements of representative occupations such as mail clerk, information router, and mechanic assembler. Tr. 36. The ALJ further found, based on the testimony of the VE, that since December 14, 2010, Brown is unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy. *Id*. Accordingly, Brown became disabled on December 14, 2010, and thus eligible for SSI on June 27, 2011, but not under a disability at any time through her last insured date of September 30, 2010, and thus ineligible for DIB. Tr. 36-37.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v.*

*Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9ᵗʰ Cir 2008), citing *Parra v. Astrue*, 481

F3d 742, 746 (9ᵗʰ Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9ᵗʰ Cir

2001).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn

from the record." *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9ᵗʰ Cir 2008), quoting *Batson*

*v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9ᵗʰ Cir 2004); *see also Lingenfelter*,

504 F3d at 1035.

## DISCUSSION

Brown argues the ALJ erred in four respects by:  (1) not properly considering the

opinions and conclusions of her treating physician and nurse concerning the severity of her

impairments; (2) rejecting her subjective symptom testimony without stating clear and

convincing reasons; (3) lacking a substantial evidentiary basis for determining that her

impairments were not of disabling severity prior to December 14, 2010; and (4) basing his

decision on an incomplete hypothetical question to the VE.[3]  Brown's arguments on all four

claims boil down to one issue, namely whether there was a reasonable medical basis in the

record for finding her disabled as of December 14, 2010, but not disabled as of

September 30, 2010, her date last insured.  As discussed below, this court concludes that the

ALJ erred with respect to determining the date when Brown became disabled.

## I.    Treating Medical Providers

Brown contends the ALJ failed to properly consider the opinions and ultimate

conclusions of her treating physician, Ted Sundin, MD, and treating nurse, Mary Knauf,

---

[3] Brown alleged, but withdrew in her Reply, a fifth claim of error that the ALJ did not properly consider the combined effect of her multiple impairments.

RN, BSN, concerning the severity of her impairments, particularly in the time period prior to her last insured date of September 30, 2010.

### A. **Legal Standard**

Disability opinions are reserved for the Commissioner.  20 CFR § 404.1527(e)(1).  If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  The ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician.  *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons.  *Id* (treating physician); *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006) (examining physician).  Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066.  An ALJ may not substitute his opinion for that of a physician.  *Day v. Weinberger*, 522 F2d 1154, 1156 (9th Cir 1975); *see also Schmidt v. Sullivan*, 914 F2d 117, 118 (7th Cir 1990) (citation omitted), *cert. denied*, 502 US 901 (1991) ("[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.  The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them.").

Although not considered to be acceptable medical sources, therapists and nurse practitioners are considered to be "other sources."  20 CFR § 404.1513(d).  The ALJ must consider "other source" testimony and provide "germane reasons" to reject it.  *Molina v.*

*Astrue*, 674 F3d 1104, 1114 (9ᵗʰ Cir 2012).  Germane reasons for discrediting testimony

include inconsistency with the medical evidence and testimony that "generally repeat[s]" the

properly discredited testimony of a claimant.  *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9ᵗʰ

Cir 2005); *Williams v. Astrue*, 493 F App'x 866, 869 (9ᵗʰ Cir 2012).

### B.    Pertinent Treatment Records

The medical records indicate that Brown was treated for depression for a period of

six years by Sylvia Chatroux, MD, beginning May 5, 2004.  Tr. 228-73.  In April 2006,

Dr. Chatroux indicated a return to work would not be advisable due to Brown's depression.

Tr. 264.  On April 14, 2009, Dr. Chatroux signed a Certification of Disability of Handicap,

reporting to the Housing Authority of Jackson County that Brown suffered a mental or

physical impairment that substantially limited one or more major life activities and which

was expected to last at least 12 months.  Tr. 250.  Dr. Chatroux contemporaneously

completed a Reasonable Accommodation/Modification Request Form, indicating that

Brown suffered from severe depression and agoraphobia.  Tr. 248-49.

On July 2, 2009, Dr. Chatroux wrote that Brown had "problems with significant

depression" over the treatment period.  Tr. 273.  Despite being "on different medications at

different times," Dr. Chatroux noted that "[f]or some reason [Brown] has never really pulled

herself out of a slump" and added: "It is hard to say whether or not she is a candidate for

ongoing employment due to the severity of her depression, and I do not feel that I would be

able to make this determination without the help of a psychiatrist."  *Id*.

On December 19, 2009, Brown went to the emergency room with complaints of

increased anxiety over a few days, with no sleep and racing thoughts.  Tr. 308.  After being

administered Ativan, Benadryl, and Haldol, Brown was released.  Tr. 310.  She returned to

the emergency room on February 16 and 25, 2010, with similar complaints of anxiety, mania, and insomnia. Tr. 298-300, 302. Both times she was assessed with mania and possible bipolar disorder and was released after receiving Depakote and Ativan. Tr. 299, 304.

Brown commenced treatment at the Jackson County Mental Health Service ("JCMH") around March 4, 2010. Tr. 431. Tamara Ulrey, MSW, QMHP, performed a Comprehensive Mental Health Assessment of Brown. Tr. 390-408. On March 22, 2010, Ulrey noted that Brown had been diagnosed by her referring doctor, Christina Hansel, DO, with bipolar disorder and anxiety and prescribed Lexapro, Abilify, and Klonopin. Tr. 395, 405. Ulrey observed Brown's inability to focus, posturing and hand-wringing psychomotor activities, inappropriate affect, and tangential thought processes. Tr. 393, 403. Ulrey reported that Brown had "poor engagement in treatment, significant ambivalence, or lack of awareness of the substance use or mental health problems, requiring a near-daily structured program of intensive engagement services to promote progress through the stages of change." Tr. 404. Ulrey's primary admitting Axis I diagnosis was Bipolar I, with a secondary diagnosis of Anxiety Disorder NOS, and Axis II diagnosis of Personality Disorder NOS. Tr. 408. She explained her diagnosis as follows:

> Client is diagnosed with Bipolar I, most recent episode manic. She describes her symptoms as "up, can't sit still, can't stop talking/thinking, frustrating, scary and freeing at the same time. She reports that "I can do things when I'm manic that I can't do usually." Client reports the associated depression as "I become suicidal, isolative, hopeless, I don't interact, I don't do anything." She is also being diagnosed with Anxiety Disorder NOS with a current trauma reaction and panic attacks with agoraphobia. . . . She has a Axis II diagnosis of

Personality Disorder with Obsessive Compulsive Traits. . . . Client has numerous socio economic stressors and her current GAF is 45.[4]

Tr. 405.

In a Treatment Plan Report dated April 12, 2010, JCMH provider Pam Johnson, MS, QMHP, described Brown's problems to be addressed through treatment as follows:

[Brown's] pattern of instability of mood, affect and sense of self coupled with impulsivity, lack of stable relationships and risk for self harm interfere with [her] ability to maintain safety in the community and to successfully carry out tasks of daily life in the domains of family, work, school and social functioning. [Brown] is prone to ongoing crisis with risk for self harm or suicide.

Tr. 410.

On April 27, 2010, Dr. Sundin performed a 75-minute psychiatric examination of Brown. Tr. 345-49. Brown complained of "severe mood swings and feel[ing] depressed right now." Tr. 345. She described "manic episodes" lasting from weeks to months, the most recent being from December 2009 through April 2010, which resulted in emergency room treatment on two occasions. *Id.*

Brown reported "lately [having] some mild to moderate depression." *Id.* She described her depressive episodes as isolating at home, an inability to get out of bed certain days, very low energy, and feeling very hopeless. *Id.* She also reported a history of being sexually abused by her father, having her son taken out of her home when he was 11 years old, and visual and auditory hallucinations of seeing lights and hearing music and voices which worsened with her mood swings. *Id.* Her current medications included Abilify,

---

[4] According to the American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorder (*4th ed., text rev. 2000) ("DSM-IV"), pp. 27-33, a Global Assessment of Functioning ("GAF") score of 41-50 indicates that the patient has "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."

Lexapro, and Klonopin.  *Id*.  Although Lexapro seemed to help somewhat, she still felt depressed.  *Id*.  Other psychiatric medications had been tried and helped for a while, but not for long or had disagreeable side effects.  Tr. 345-46.

Dr. Sundin noted significant family mental health history, including her father, sister, and brother all "questionably bipolar," two maternal cousins who committed suicide, a maternal aunt and a paternal cousin with depression and suicidal ideation, another paternal cousin with alcohol problems and two psychiatric hospitalizations, and a paternal aunt with severe mental problems.  Tr. 346.

Reporting the results of his examination, Dr. Sundin noted that Brown was "friendly and cooperative" and "alert and oriented times three."  *Id*.  She had "some anxiety and some agitation" and has "what looks like panic attacks, with a lot of fear, stomach upset, her face gets really hot, she has difficulty breathing, she feels her heart pounds and that it skips some beats."  Tr. 346-47.  Brown denied any current suicidal ideation and described herself as "mildly depressed today."  Tr. 347.  She reported that in one year's time, she may be stable in her mood for two months, then has a depressive episode and a manic episode of about five months each.  *Id*.

Dr. Sundin diagnosed Brown with Panic Disorder with agoraphobia; Bipolar I disorder, depressed, moderate; rule out schizoaffective disorder; Personality disorder NOS with borderline traits; and assigned a GAF of 55.[5]  *Id*.  He increased the dosage of Abilify and continued Lexapro and Klonopin.  *Id*.  Brown was to follow-up with Dr. Sundin in six weeks and with the nurse in two weeks.  *Id*.

---

[5]  In another portion of the Psychiatric Evaluation, however, Dr. Sundin assigned a GAF of 45.  Tr. 349.  The record contains no explanation for the differing GAF scores.

11 - OPINION AND ORDER

On June 8, 2010, Brown saw Dr. Sundin again.  It is not clear from the record whether she saw a nurse in the interim, but based on Dr. Sundin's notes, it appears she did. Tr. 389.  Dr. Sundin noted that the increase in Abilify actually made Brown feel worse; she had stopped taking it on May 19, 2010; and "[w]e instead tried to increase the Lexapro . . . on [May 25, 2010]."  *Id*.  Brown reported she was "maybe 5%-10% improved," rated her depression as "presently 3 to 4 out of 10" and reported she was isolating at home and had "suicidal ideation off and on."  *Id*.  Dr. Sundin continued Lexapro and Klonopin, started Lamictal, and directed Brown to return to see him in 8-10 weeks and the nurse in four weeks.  *Id*.

On July 6, 2010, Brown told RN Knauf she had stopped taking Lamictal on July 2, 2010, because it made her more depressed, suicidal, anxious, and paranoid.  Tr. 388.  She had no appetite and had lost 15 pounds over the last month.  *Id*.  Brown reported slowly starting to feel better and less depressed; her depression varied from "5-8/10" but was over 10 while on Lamictal.  *Id*.  She constantly felt apprehensive and continued "to feel worthless, hopeless and with no future."  *Id*.  She had more thoughts of suicide in the prior few weeks, and her responses to Abilify and Lamictal made her afraid to try another medication.  *Id*.  She continued therapy with Johnson (though no notes of her visits with Johnson are in the record).  *Id*.  Objectively, RN Knauf noted Brown appeared tired with an anxious affect and thoughts "hopeless in content."  *Id*.  RN Knauf assessed Brown as "still [having] significant depressive symptoms" and increased mood instability with Lamictal, "but beginning to return to her baseline."  *Id*.  Brown was to continue on Lexapro and Klonopin and return for a follow-up in two weeks.  *Id*.

On July 20, 2010, Brown told RN Knauf that she continued "to be very depressed although not as depressed as she was when she was taking the Lamictal." Tr. 387. Brown rated her depression as "6-10 on a scale of 10." *Id*. RN Knauf observed that Brown was tearful at times with a blunted affect and thoughts "sequential but of a hopeless content," and assessed Brown with "[o]ngoing depression which has not responded well to various medications" and "a persistent sense of hopelessness." *Id*. Upon consultation with Dr. Sundin, RN Knauf prescribed Seroquel and scheduled a follow-up appointment. *Id*.

On August 4, 2010, Brown reported to RN Knauf "a mild decrease in depressive symptoms . . . ranging from 5-9 on a scale of 10." Tr. 386. RN Knauf observed that Brown's affect was blunted, her voice was soft and monotone, and her thoughts were sequential. *Id*. RN Knauf assessed "some mild decrease in depression and SI although both remain significant and continue to have a negative impact on [Brown's] quality of life." *Id*. After consulting with Dr. Sundin, the Seroquel dosage was increased. *Id*.

August 17, 2010, Brown reported to Dr. Sundin that she felt "moderately better in her depression" with nearly no suicidal ideation since increasing her Seroquel dosage. Tr. 385. However, "just a month ago, she was very depressed and was suicidal" and isolating in her room. *Id*. Brown reported doing better in the last few weeks. *Id*. Dr. Sundin observed that Brown still looked depressed, but improved from before. *Id*. He continued his prior diagnoses and continued her medications. *Id*. Brown was to see the nurse in six weeks and Dr. Sundin in ten weeks. *Id*.

On September 8, 2010, Brown told RN Knauf that she was "feeling about 30% better" and rated her depression "a 6/10." Tr. 384. She noted a decrease in suicidal ideation and, while still hearing some vague whispering and voices, it was much improved. *Id*. Her

sleep was good, but "some days she had trouble getting out of bed due to fatigue and depression." *Id*. Despite "some decrease in depressive symptoms," RN Knauf assessed Brown as "continu[ing] to have some difficult with daily functioning and maintaining a consistent mood." *Id*.

On September 29, 2010, Brown reported to RN Knauf that she had reduced her Seroquel dose because it gave her an uncontrollable appetite. Tr. 383. Since reducing the dose, Brown noticed an increase in depression and passive suicidal ideation. *Id*. Her affect was blunted with thoughts sequential and appropriate in content. *Id*. Assessing "increased depression with lower dose of Seroquel," RN Knauf noted Brown was "at risk for increased mood instability at this time." *Id*. RN Knauf consulted with Dr. Sundin who gave Brown the option of Lithium or Geodon. *Id*. Brown chose to try Geodon. *Id*.

On October 15, 2010 (shortly after the last insured date), Brown reported to RN Knauf that she was unable to continue to taking Geodon due to a rash she developed. Tr. 381. Upon review, Dr. Sundin recommended that Brown start Lithium, which she did. *Id*.

On October 26, 2010, Brown reported to Dr. Sundin that the Lithium was helpful and that her depression had decreased from 5-6 to 4 out of 10. Tr. 380. Brown stated "that how she is feeling today is the best that she has done since April of 2010." *Id*. Dr. Sundin continued his diagnoses and current medications and ordered a follow-up in two weeks to determine Brown's Lithium level. *Id*.

On November 9, 2010, Brown reported to RN Knauf "an improvement in her mood since being on the Lithium." Tr. 379. She continued to have depression, but it had improved with fewer mood fluctuations. *Id*. Brown had ongoing suicidal ideation, but not

as intense and she did not intend to act on those thoughts. *Id*. Although improved,

RN Knauf assessed Brown as having "some residual symptoms of depression and anxiety

that impact her daily functioning." *Id*.

On December 14, 2010, Brown reported to Dr. Sundin that "she still feels really

depressed." Tr. 378. Dr. Sundin found it interesting that Brown said "she's not sure that

she wants to get better," adding that "[s]he is very impaired. I don't see that she would be

able to go back to any continuous work experience here for years." *Id*. Dr. Sundin

increased her Lithium and ordered continuing monitoring of her Lithium levels. *Id*.

On January 4, 2011, Brown reported to RN Knauf that she "continues to feel

depressed and tired." Tr. 377. She no longer had suicidal urges, but RN Knauf assessed

that "her depression continues and has a significant impact on [her] quality of life. *Id*.

### C.    Analysis

Based on his review of the record, the ALJ concluded that:

> Between the alleged onset date in December 2004, and the last quarter
> of 2009 [last insured date], [Brown's] mental impairments were
> sufficiently controllable that she had no substantial psychological
> limitations. Her overall good status was shown in both her own self-
> report, and in more objective measures such as her mental status
> examinations, with frequent references to good affect. No prolonged
> period of dysfunction is indicated, and what waxing as is referred to in
> the record was addressed by adjusting or restarting medications.

Tr. 32.

Elsewhere, the ALJ noted that "[i]n the period leading up to December 2010,

[Brown's] disorders had become moderate in extent." Tr. 27. The ALJ found no change in

the nature or extent of Brown's symptoms "until December 19, 2009, when she went to an

emergency room with complaints of increased anxiety over a few days, with no sleep and

racing thoughts." Tr. 31. The ALJ described the two subsequent visits to the emergency

room in February 2010 with the same complaints. *Id*.

When Brown began treatment at JCMH in April 2010, the ALJ noted that "she was

seen to have poor eye contact, rapid speech, and inappropriate affect." Tr. 32. As for the

ensuing treatment with JCMH providers from April through December 2010, the ALJ

summarized the records as follows:

> Subsequent notes from Dr. Sundin indicate a waxing and waning of
> symptoms. . . . In August 2010, her mood had improved with
> Seroquel, and while she had a blunted affect in September 2010, in
> October she reported improvement with Lithium, and in fact reported
> that she was doing better in November 2010. Dr. Sundin diagnosed
> panic disorder with agoraphobia, Bipolar disorder mild, mild to
> moderate; and personality disorder with borderline traits. . . .
>
> Dr. Sundin stated on December 14, 2010, that [Brown] reported that
> she was very depressed, and that she was not sure that she wanted to
> get better. Dr. Sundin concluded that she was very impaired, and that
> he did not see that she would be able to go back to any continuous
> work experience for years.

Tr. 32.

The ALJ concluded that "[a]s of December 14, 2010, [Brown's] symptomatology

[*sic*] had reached the point that she could no longer sustain regular and continuing work."

Tr. 27. As the basis for this conclusion, the ALJ explained as follows:

> As of December 14, 2010, Dr. Sundin, who at that point had become
> [Brown's] treating psychiatrist, *revised his earlier opinions* and found
> she could not sustain work. Although given in general terms, his
> conclusions are consistent at least with deterioration in [Brown's]
> condition so that even with her limitations on the nature of work she
> would perform, her ability to perform such work on a regular and
> continuing basis would be unduly disrupted by psychological
> symptoms. She would be absent from work two or three days a month.

Tr. 34 (emphasis added).

16 - OPINION AND ORDER

In fact, Dr. Sundin neither stated nor implied that Brown's condition had "deteriorated," much less reached such a severe level of impairment on December 14, 2010, that she crossed a threshold into having a disability which had not previously been present.

The Commissioner argues that at no point prior to December 14, 2010, did Dr. Sundin state that Brown was incapable of working. However, the absence of a specific medical opinion or silence in a medical report is not substantial evidence. *Lauer v. Apfel*, 245 F3d 700 (8th Cir 2001) (a physician's silence on an issue does not satisfy the Commissioner's burden to support a decision with substantial evidence). When a physician is not asked to assess the claimant's ability to work, his or her "silence on this question cannot be used as substantial evidence [the claimant] is not disabled." *Page-Fires v. Astrue*, 564 F3d 935, 943 (8th Cir 2009).

Moreover, Dr. Sundin had never previously opined that Brown could sustain work. To the contrary, on December 14, 2010, Dr. Sundin noted that Brown "*still* feels really depressed," indicating continuity of her condition rather than a new level of severity. Tr. 378 (emphasis added). The fact that Dr. Sundin "noted improvement" at times from April through December 2010 does not itself establish an ability to function in the workplace. *See Holohan v. Massanari*, 246 F3d 1195, 1205 (9th Cir 2001) (that a person suffering severe symptoms "makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace").

Indeed, as described above, in the months leading up to December 14, 2010, the treatment records from JCMH indicate that Brown's mental status was at times worse than it appeared on December 14, 2010. The records show fluctuations in the severity of Brown's condition over that period, including improvements with certain medications, but also

periods of severe and debilitating symptoms of depression and anxiety, as well as reactions to and side effects from medications which were being tried.

Notably, the ALJ does not address the treatment records of RN Knauf from that period. In June 2010, RN Knauf assessed Brown with continued, significant depressive symptoms and mood instability, an assessment she reiterated in July and August. Tr. 386-88. On September 8, 2010, RN Knauf assessed Brown as continuing to have difficulty with daily functioning. Tr. 384. On September 29, 2010, RN Knauf assessed an increase in Brown's depression and suicidal ideation and "risk for increased mood instability." Tr. 383.

Although disability opinions are reserved for the Commissioner, medical opinions from a treating physician or any other source "must never be ignored." even when they bear upon issues reserved to the ALJ. SSR 96−5p, 1996 WL 374183, at *2. Rather, they must be evaluated to determine the extent to which they are supported by evidence in the record. *Id*. Here, the ALJ provided no reason whatsoever, let alone a germane reason, for failing to credit RN Knauf's assessment of Brown's mental status.

The ALJ determined that Brown became disabled as of December 14, 2010, based upon the RFC findings. The ALJ found Brown had the same RFC prior to and after December 14, 2010, with one crucial exception: after December 14, 2010, the RFC included the limitation that Brown would likely be absent from work two or more days a month, on account of the intrusion of mental health symptoms. Tr. 27. As the VE testified, given this limitation, there are no jobs in the national economy that Brown could perform. Tr. 782. As the record stands, it is unclear whether, in the absence of the ALJ's errors noted above, the same limitation would be more appropriately applied at some time prior to Brown's last-insured date of September 30, 2010, and, if so, when.

II.    **Remand**

Remand for further proceedings is appropriate when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010). The court may, but is not required to, "credit as true" rejected evidence prior to remand. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit "when, even if the evidence at issue is credited, there are 'outstanding issues that must be resolved before a proper disability determination can be made.'" *Id* at 1035, quoting *Vasquez v. Astrue*, 572 F3d 586, 593 (9th Cir 2009).

As discussed above, the ALJ erred in failing to properly consider the opinions of Brown's treating physician and nurse, Dr. Sundin and RN Knauf, concerning the date when Brown became disabled. The question remains whether, given Brown's mental health symptoms from at least December 2009 through her last insured date of September 30, 2010, the ALJ's RFC adequately accounted for her nonexertional limitations, specifically whether her likely absence from work two or more days a month due to the intrusion of mental health symptoms would more appropriately be included in the RFC at some date prior to September 30, 2010. Under these circumstances, a remand for further proceedings is appropriate.

### ORDER

The Commissioner's decision is REVERSED AND REMANDED for further administrative proceedings pursuant to Sentence Four of 42 USC § 405(g).

DATED this 16th day of January, 2016.

s/ Janice M. Stewart
                Janice M. Stewart
                United States Magistrate Judge